**Curtis M. LOFTIN, Plaintiff,**

v.

**KIRBY INLAND MARINE, L.P., Defendant.**

Civil Action No. 1:06–CV–739.

United States District Court, E.D. Texas, Beaumont Division.

July 7, 2007.

Dennis L. Brown, Attorney at Law, Emmanuel Nick Cokins, of Law Office of Dennis L. Brown, Houston, TX, for Plaintiff.

Dennis John Sullivan of Stepp & Sullivan, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

MARCIA CRONE, District Judge.

Pending before the court is Plaintiff Curtis M. Loftin's ("Loftin") Motion for Emergency Relief as to Determination of Entitlement to Maintenance and/or Cure (# 11). Loftin alleges that on February 22, 2006, he was injured while performing his regular duties aboard the M/V *El Paso,* thereby injuring his back and other parts of his body. He claims that his injuries were caused by Defendant Kirby Inland Marine, L.P.'s ("Kirby") Jones Act negligence and the unseaworthiness of the M/V *El Paso.* Loftin contends that he is entitled to maintenance and cure before trial on the merits of his claims. Conversely, Kirby argues that triable issues of fact remain as to the circumstances of Loftin's injuries and therefore maintains that the motion should be denied. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that Loftin is not entitled to relief at this juncture.

### I. *Background*

Kirby hired Loftin in October 2005 as a deckhand/tankerman trainee. In connection with the application process, Loftin was required to complete a standardized health history questionnaire and submit to a pre-employment physical examination. On the "Personal Health History" portion of the questionnaire, Loftin listed two previous back surgeries—a laminectomy/diskectomy in 1991 and 1994. In response to a subsequent question regarding work-related accidents, Loftin failed to disclose that these surgeries stemmed from an injury he sustained while performing his regular duties in the U.S. Navy. In fact, he noted only one minor work-related injury—a bruised foot, which he suffered in 2005 while working as a machinist for Elite Precision Fabricators.

On October 31, 2005, U.S. Healthworks in Houston, Texas, performed a pre-employment physical examination of Loftin, which incorporated a review of his completed questionnaire. The medical examiner inquired further about Loftin's two prior surgeries as well as his foot injury. Loftin, as indicated by the medical examin-

er's comments on the questionnaire, denied any lingering problems in these areas. Specifically, in terms of the two prior surgeries, Loftin conveyed to the medical examiner that he did not have residual problems with his range of motion or back strength. Accordingly, Loftin was deemed fit for service.

On February 22, 2006, Loftin was serving as a deckhand/tankerman trainee aboard the M/V *El Paso*, a vessel owned by Kirby. When his shift began around midnight, the M/V *El Paso* was moored alongside two barges. The previous shift, then relieved by Loftin and other crew members, had been preparing to connect the two barges with a crossover hose.[1] A crane attached to the M/V *El Paso* lifted the heavy crossover hose from the vessel and placed it on the deck of one of the barges. Two tankermen from the M/V *El Paso* then lifted the hose—one in front and the other in the middle of the hose. They then moved the hose a few feet before asking Loftin for assistance. Complying with his crew members' request, Loftin picked up the rear of the hose by the steel plate. Loftin alleges that, only moments later and without warning, the other two tankermen dropped the hose, causing Loftin to fall to the deck. Although Loftin initially indicated that he experienced some physical discomfort from his fall, he stated that he was "more embarrassed than anything" and continued to work until his shift ended at 6:00 a.m.

Following this shift, Loftin transferred to another vessel owned by Kirby, the M/V *Roan*, where he worked two shifts. Loftin claims that, during his first shift, the pain from his fall on the M/V *El Paso* began to intensify, impacting his job performance.

The captain noticed Loftin's difficulty with his assigned duties and confronted him. At that time, Loftin informed the captain of the events aboard the M/V *El Paso* and indicated that he was currently in pain. The captain responded by asking Loftin if he would like to file a formal report. Loftin declined, stating that he "wanted to keep working."

Taking into consideration Loftin's alleged condition, the captain assigned him to a less strenuous task during his second shift—painting the engine room. Loftin painted an area about the "size of a chair" before claiming to be overcome with pain. He then decided to file a formal report with the captain and requested to be taken ashore. The captain complied and immediately contacted Kirby. The vessel interrupted its operations at sea to rendezvous with a Kirby driver at a dock near Beaumont, Texas. The driver transported Loftin to the emergency room at San Jacinto Methodist Hospital in Baytown, Texas. Although the details of Loftin's emergency room visit are not currently before the court, the record reflects that Loftin spent several hours at the hospital and was ultimately administered an injection for his pain.

Concurrent with Loftin's emergency room visit, Kirby initiated steps to provide Loftin with additional care. Kirby arranged transportation from San Jacinto Methodist Hospital to Wilson Hall, a Kirby facility where Loftin was provided temporary accommodations. An appointment with U.S. Healthworks was also scheduled for the following morning, as well as round-trip transportation to that facility in Houston.

---

1. When two barges are tied off side by side, a crossover hose is stretched across both vessels so that they may be loaded or unloaded simultaneously. The crossover hose on the M/V *El Paso* was made of a rubber material and was approximately twenty to thirty feet long, eight to ten inches in diameter. Steel plates, approximately fourteen to fifteen inches in diameter and three-fourths of an inch thick, flanked both ends of the hose.

On February 24, 2006, two days after his alleged injury, Loftin arrived for the first of a series of appointments that continued through March 23, 2006. During this period, Loftin received physical therapy treatments, medication, and an MRI on March 6, 2006. U.S. Healthworks also referred him to an orthopedic surgeon, Dr. David Vanderweide ("Dr. Vanderweide"), for an examination. Dr. Vanderweide performed a physical examination on March 13, 2006, which involved a neurological evaluation[2] of Loftin's cervical spine. He also performed a Tinel's test, "another extension of the neurological evaluation in the peripheral skeleton." These tests are designed to reveal nerve damage. Dr. Vanderweide found nothing abnormal with regard to Loftin's test results. Additionally, he reviewed the MRI report, which indicated that the soft tissue strains to Loftin's neck and lower back were superimposed upon existing, significant degenerative changes in his back. The MRI report, according to Dr. Vanderweide, also revealed a bulging disc stemming from an undetermined cause. He concluded, however, that the degenerative changes were not likely to be caused by the incident aboard the M/V *El Paso*, as "these changes were long-standing in nature and require a long period of time to evolve." He recommended the continuation of physical therapy and concluded that Loftin did not need surgery.

Dr. Vanderweide subsequently referred Loftin to Dr. Michael Graham ("Dr. Graham"), an orthopedic surgeon who specializes in spinal conditions. Dr. Graham first saw Loftin as a consulting physician on March 30, 2006. At that time, Loftin's principal complaint was of lower back pain radiating into both legs. Dr. Graham inspected a copy of Loftin's MRI report and concluded that Loftin suffered from ad-

vanced degenerative disc disease, arthritis, and a bulging disc. He indicated that these conditions were not due to an acute injury, but that the problem had existed for "many, many years." Dr. Graham also performed a physical examination of Loftin, which yielded no "significant muscular paralysis or weakness of his legs" and revealed that Loftin's "reflexes were within normal limits." According to Dr. Graham, these results signify that Loftin's "nerves in his lower back were all working properly on the date that [he] examined him." Additional tests showed the absence of a pinched nerve. Thus, Dr. Graham determined that any type of invasive treatment would be premature. Further, he indicated that generally, patients with this type of injury should first undergo six months to one year of comprehensive conservative treatment consisting of weight loss, exercise, physical therapy, chiropractic treatment, and medications. Specifically, Dr. Graham prescribed Celebrex, a widely used anti-inflammatory medication, to be taken concurrently with the vicodin, zanaflex, and Iodine already prescribed to Loftin.

On May 2, 2006, during a follow-up visit with Dr. Graham, Loftin indicated that his back pain had not improved. He also reported that he had neglected to commence the recommended physical therapy. Accordingly, Dr. Graham advised Loftin to see his primary care physician for a complete medical evaluation to make sure that he did not have any non-orthopedic problems contributing to his current symptoms. Dr. Graham also recommended that Loftin commence four weeks (three times a week) of physical therapy with the Spine & Rehabilitation Center. Loftin complied and met with Dr. Todd Custer ("Dr. Custer"),

---

**2.** Dr. Vanderweide explained that a neurological evaluation consists of three basic parts: (1) assessing the reflexes for muscle groups in a given area, (2) assessing reflex strength, and (3) assessing whether the reflex sensations are intact.

a chiropractor, at the Spine & Rehabilitation Center on May 23, 2006. Dr. Custer provided Loftin physical therapy three times a week for four weeks and continued with additional tests.

Loftin returned to Dr. Graham's office on June 13, 2006. At that time, Loftin informed Dr. Graham that his condition was improving. Dr. Graham then recommended that Loftin continue with physical therapy and scheduled an additional follow-up appointment in July 2006. Loftin never returned to Dr. Graham's care. Loftin, however, continued to meet with Dr. Custer, obtaining multiple chiropractic and physical therapy treatments. In all, Loftin had twenty-one visits with Dr. Custer, ending February 20, 2007. During these visits, Loftin underwent therapeutic exercises, an ultrasound on the lumbar spine, deep tissue massages, as well as ice and electric stimulation. Spinal manipulative therapy[3] was also utilized in the lumbar region.

Ultimately, due to Loftin's unresponsiveness to conservative treatment combined with his MRI results indicating a bulging disc, Dr. Custer referred Loftin to Dr. David Strausser ("Dr. Strausser"), another orthopedic surgeon. Dr. Strausser performed a physical examination of Loftin on August 28, 2006. His examination revealed that Loftin was suffering from back pain and a degenerative disc in the lumbar spine, but he saw no evidence of any nerve impingement. Dr. Strausser informed Loftin that, depending upon other test results, such as a lumbar discogram, having his vertebrae fused could be an option. This would entail inserting "instrumentations" into the vertebrae to prevent them

from moving. Elimination of the motion could eliminate or reduce the pain. According to Dr. Strausser, surgery such as this would require an average of four to six months of postoperative care.

Loftin subsequently requested pre-authorization for additional treatment by Dr. Strausser in August 2006. Kirby, after noting that "Loftin had not complied with the recommended treatment and advices of Dr. Michael Graham, and specifically that he had not returned to his primary care physician for further examination, in an attempt to determine if Loftin's symptoms were the result of a non-orthopedic problem," denied pre-authorization. Loftin, now claiming a further need for additional medical treatment, files this instant motion seeking Emergency Relief as to Determination of Entitlement to Maintenance and/or Cure. In opposition, Kirby argues that the motion is premature at this juncture. Kirby contends that Loftin willfully misrepresented or concealed a pre-existing physical condition on a pre-employment health history questionnaire, a valid defense to maintenance and cure. Moreover, Kirby maintains that, at the very least, triable issues of fact exist regarding Loftin's entitlement to maintenance and/or cure.

## II. Analysis

### A. Standard of Review

The question before the court is whether Loftin's request for maintenance and cure should be decided by the court at this stage in the proceedings or denied as premature. Here, Loftin's motion, while not styled as such, appears to be a motion for

---

**3.** The Spine & Rehabilitation Center's Patient Agreement explains that "[s]pinal manipulation consists of adjustments that seek to restore normal function to the spine and other joints. Typically, this involves applying a specific, highly-controlled treatment directly to a joint or muscle. This treatment often reduces or eliminates both local and referred pain, allows muscle spasms to relax, and may even release the irritation from the nervous system, which may result in other health benefits."

partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking a final determination from the court regarding Loftin's entitlement to retroactive and future maintenance and cure. "Other than a motion for summary judgment, we are aware of no procedure of obtaining pre-trial judgment on the merits of a claim." *Guerra v. Arctic Storm, Inc.*, No. C04–1010L, 2004 WL 3007097, at *1 (W.D.Wash. Aug. 4, 2004) (quoting *McNeil v. Jantran, Inc.*, 258 F.Supp.2d 926, 930 (W.D.Ark.2003)); *see also Blake v. Cairns*, No. C–03–4500, 2004 WL 1857255, at * 1 (N.D.Cal. Aug. 16, 2004); *Bloom v. Weeks Marine, Inc.*, 225 F.Supp.2d 1334, 1336 (M.D.Fla.2002) (" '[U]nless the seaman can show that there are no material facts in dispute and that he is entitled to summary judgment on the claim, he cannot obtain a pre-trial order for payment [of maintenance and cure].' " (quoting *Sanfilippo v. Rosa S. Inc.*, Civ. A. No. 85–3915, 1985 WL 4565, at *2 (D.Mass. Dec. 9, 1985))). Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which he believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir.2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir.2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir.2006); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir.2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir.2001); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n. 3, 106 S.Ct. 2548 (quoting FED.R.CIV.P. 56(e)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir.2004); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir.2003); *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir.1999), *cert. denied*, 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000). "[T]he court must review the record 'taken as a whole.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir.2005). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the

evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996); *see Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith*, 391 F.3d at 624; *Malacara*, 353 F.3d at 398; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir.2003); *Harken Exploration Co.*, 261 F.3d at 471; *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir.), *cert. denied*, 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in its favor. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir.2004); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir.2003); *Martinez*, 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir.), *cert. denied*, 540 U.S. 815, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003); *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir.2002).

### B. *Maintenance and Cure*

 "From its dawn, the maritime law has recognized the seaman's right to maintenance and cure...." *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41, 63 S.Ct. 488, 87 L.Ed. 596 (1943). It is "an obligation imposed upon a shipowner to provide for a seaman who becomes ill or injured during his service to the ship." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir.2002) (citing *Silmon v. Can Do II, Inc.*, 89 F.3d 240, 242 (5th Cir.1996)). " 'Maintenance is a *per diem* living allowance' " provided to a seaman for expenses incurred while ashore recovering from injury or illness. *Cooper v. Diamond M Co.*, 799 F.2d 176, 179 (5th Cir.1986), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2177, 95 L.Ed.2d 834 (1987) (quoting

*Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir.1979)). An injured seaman, under the doctrine of maintenance, is entitled to " 'food and lodging of the kind and quality he would have received ... aboard [the] ship.' " *Hall v. Noble Drilling (U.S.) Inc.*, 242 F.3d 582, 586 (5th Cir.2001) (quoting *Tate v. American Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir.1981)). " 'Cure involves the payment of therapeutic, medical and hospital expenses' " associated with the treatment of a seaman's injury or illness. *Cooper*, 799 F.2d at 179 (quoting *Pelotto*, 604 F.2d at 400). "The duty to provide cure encompasses not only the obligation to reimburse medical expenses actually incurred, but also to ensure that the seaman receives the proper treatment and care." *Boudreaux*, 280 F.3d at 468 (citing *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1500 (5th Cir.1995), *cert. denied*, 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996)).

 "The vessel owner's obligation to provide this compensation does not depend on any determination of fault, but rather is treated as an implied term of any contract for maritime employment." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir.2006) (citing *McCorpen v. Central Gulf S.S. Corp.*, 396 F.2d 547, 548 (5th Cir.), *cert. denied*, 393 U.S. 894, 89 S.Ct. 223, 21 L.Ed.2d 175 (1968)). A seaman is entitled to maintenance and cure until he reaches maximum cure, that is, "where it is probable that further treatment will result in no betterment in the claimant's condition." *Boudreaux*, 280 F.3d at 468 (quoting *Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir.1996)).

 " 'A shipowner must pay maintenance and cure for any illness or injury which occurred, was aggravated, or manifested itself while the seaman was in the ship's service.' " *West v. Midland Enters., Inc.*, 227 F.3d 613, 616 (6th Cir.2000)

(quoting *Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1357–58 (6th Cir.), *cert. denied*, 519 U.S. 981, 117 S.Ct. 433, 136 L.Ed.2d 331 (1996)); *see also McCorpen*, 396 F.2d at 548. A shipowner may not unreasonably deprive a seaman of maintenance and cure. *McNeil v. Jantran, Inc.*, 258 F.Supp.2d 926, 931 (W.D.Ark.2003). The United States Court of Appeals for the Fifth Circuit has explained:

> [T]here is an escalating scale of liability: a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.

*Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 177 (5th Cir.2005), *cert. denied*, —— U.S. ——, 127 S.Ct. 382, 166 L.Ed.2d 268 (2006) (quoting *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir.1987)).

▮ In order for a plaintiff to recover for maintenance and cure, he need only show that "(1) he was working as a seaman; (2) he was injured while in service to the vessel; and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury." *McNeil*, 258 F.Supp.2d at 931 (citing *West*, 227 F.3d at 616); *Freeman v. Thunder Bay Transp. Co.*, 735 F.Supp. 680, 681 (M.D.La.1990). "The 'right to recover for maintenance and cure is broad and the burden of proof is ... relatively light since recovery is not dependent on the negligence or fault of the vessel or its owner.'" *West*, 227 F.3d at 616 (quoting *Freeman*, 735 F.Supp. at 681); *see also Aguilar v.*

*Standard Oil Co.*, 318 U.S. 724, 730–31, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) ("So broad is the shipowner's obligation that negligence or acts short of culpable misconduct on the seaman's part will not relieve him of the responsibility."). " '[A]mbiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman.' " *Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir.1987) (quoting *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n. 2 (5th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982)); *accord Vaughan v. Atkinson*, 369 U.S. 527, 531–32, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

### C. Employer's Defense—Willful Concealment of a Pre–Existing Medical Condition

▮ Although a seaman's right to maintenance and cure is broad, it is "subject to a few narrow exceptions." *Britton v. U.S.S. Great Lakes Fleet, Inc.*, 302 F.3d 812, 816 (8th Cir.2002); *Wactor v. Spartan Transp. Corp.*, 27 F.3d 347, 352 (8th Cir. 1994); *Oswalt v. Williamson Towing Co.*, 488 F.2d 51, 53 (5th Cir.1974). A seaman who intentionally misrepresents or conceals medical facts from an employer when applying for work risks forfeiture of his right to maintenance and cure if the misrepresented or non-disclosed facts are material to the vessel owner's employment decision. *Jauch*, 470 F.3d at 212 (citing *McCorpen*, 396 F.2d at 548–49). To assert this affirmative defense successfully, an employer/vessel owner has the burden of proving each of the following elements: "(1) the claimant intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit." *Brown*, 410 F.3d at 171 (citing *McCorpen*, 396 F.2d at

548–49). "If the vessel owner would have employed the seaman even had the requested disclosure been made, concealment will not bar the seaman's recovery of maintenance and cure." *Jauch,* 470 F.3d at 212. The question of whether the employer/vessel owner would have hired the seaman had he disclosed the prior injury is a question of fact for the jury. *Bodden v. Professional Divers of New Orleans, Inc.,* No. 01–795, 2001 WL 1223589, at *2 (E.D.La. Oct. 12, 2001); *Parker v. Noble Drilling Corp.,* No. Civ. A. 98–1196, 1999 WL 104414, at *2 (E.D.La. Feb. 19, 1999) (citing *Ruiz v. Plimsoll Marine, Inc.,* 782 F.Supp. 315, 317 (M.D.La.1992)).

In the case at bar, Loftin argues that he is entitled to maintenance and cure due to injuries sustained while in service aboard the M/V *El Paso.* It is undisputed that Loftin was employed by Kirby on February 22, 2006, when the injury allegedly occurred. Kirby, however, maintains that it has raised a valid defense—Loftin's failure "to disclose a preexisting medical condition." Kirby does not seek summary judgment on this affirmative defense; rather, it contends that triable issues of fact exist as to Loftin's entitlement to maintenance and cure.

"Failure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information ... satisfies the 'intentional concealment' requirement." *Brown,* 410 F.3d at 174 (quoting *Vitcovich v. OCEAN ROVER O.N.,* No. 94–35047, 1997 WL 21205, at *3 (9th Cir. Jan. 14, 1997)). Here, the parties disagree on whether Loftin intentionally misrepresented or concealed material facts. Kirby claims that Loftin "failed to disclose problems with his back" during the application process. Specifically, Kirby points out that Loftin did not reveal that "in 2000[,] he walked into a physician's office requesting pain medication for his back," and that in 2002, he was treated

by a physician at the Veteran's Administration for back-related problems. Loftin, however, asserts that Kirby's health history questionnaire "does not seem to request a listing of every time a person has attended a medical facility" and that "most individuals do not remember every single doctor and date of visit." He argues that although he failed to disclose his request for pain medication for his back (which was six years prior to the accident), he adequately disclosed his back problems. He also maintains that he answered in the affirmative to a question on Kirby's health history questionnaire inquiring whether Loftin ever had "[b]ack pain or injury."

On the "Personal Health History" portion of the questionnaire, Loftin, in response to a question regarding "hospitalizations, major illnesses or injuries," listed two prior back surgeries—a laminectomy/diskectomy in 1991 and 1994. He also acknowledged that the 1991 surgery resulted in his honorable discharge from the military on June 12, 1992. Moreover, on a physical capacity assessment performed during his physical examination, Loftin answered "Yes" to the following questions: (1) Do you currently have back pain or a back problem; (2) Have you ever had back surgery; (3) Have you ever had pain extending into one or both legs; (3) Have you ever had to take more than two weeks off from work or school due to a back problem; (4) Have you ever had to consult a health professional for back pain? The medical examiner's comments reveal, however, that follow-up questions were asked and that Loftin denied any residual problem with his range of motion or back strength.

Kirby further contends that Loftin concealed other medical facts. The health history questionnaire asks if Loftin "ever had any work related injuries." In response, Loftin disclosed only one, minor, work-related injury—a bruised foot, which

he suffered in 2005 while working as a machinist for Elite Precision Fabricators. In addition, at his deposition, when asked why he failed to disclose an ankle injury at Target that resulted in a missed week of work, Loftin responded that he did not have an answer. In any event, Kirby has proffered evidence that Loftin did not reveal that his prior back surgeries were due to work-related injuries or that he had continuing back problems, thus creating a material issue of fact as to this element of its affirmative defense.

Additionally, issues of fact remain regarding the materiality of the allegedly concealed back injuries. Case law indicates that under the second prong of the *McCorpen* defense, "[t]he fact that an employer asks a specific medical question on an application, and that the inquiry is rationally related to the applicant's physical ability to perform his job duties, renders the information material for the purpose of this analysis." *Brown,* 410 F.3d at 175. Here, Kirby required Loftin to adhere to its formal application process, including the completion of a health history questionnaire. Questions included on the questionnaire appear to be designed to ascertain the existence of any medical condition, past or present, which may impact Loftin's ability to perform his desired job. Nonetheless, Loftin argues that despite certain omissions, his previous back problems were apparent from the answers he provided. The court notes that Kirby extended an offer of employment, despite being aware of Loftin's back surgeries in the preceding decade. Ultimately, however, a question of fact exists as to whether Loftin's omissions were material to Kirby's hiring decision.

Finally, "[t]here is no requirement that a present injury be identical to a previous injury. All that is required is a causal link between the pre-existing disability that was concealed and the disability incurred."

*Brown,* 410 F.3d at 175. Causation is clear when an employee claims an injury in the exact same area as his previous injury. *Id.* at 176 (citing cases); *Weatherford v. Nabors Offshore Corp.,* No. Civ. A. 03–0478, 2004 WL 414948, at *2 (E.D.La. Mar. 3, 2004) ("Where plaintiff claims an injury in the exact same area of the back as was previously injured, the causal connection is clear."); *In re L.S.K. Towing, Inc.,* Civ. A. No. 94–4134, 1995 WL 350039, at *2 (E.D.La. June 6, 1995); *Lancaster Towing, Inc. v. Davis,* 681 F.Supp. 387, 389 (N.D.Miss.1988). In this case, Kirby has provided the court with medical records showing that Loftin's previous injuries and the injury he allegedly sustained in February 2006 are, at the very least, located in the same area of his anatomy. Thus, viewing the facts in a light most favorable to Kirby, the court finds that disputed issues of material fact prevent a determination that Loftin is entitled to maintenance and cure.

### III. Conclusion

Accordingly, in light of the issues of fact remaining in this case, Loftin's motion for maintenance and cure is DENIED.